JUDGE LYNCH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 1954

---------------------------------------------------------X

COMPANIA SUD AMERICANA DE VAPORES,    :     08 Civ. _____

             Plaintiff,            :

      - against -               :      ECF CASE

ALLIED MARITIME INC. a/k/a ALLIED MARITIME,    :

           Defendant.         :

---------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, COMPANIA SUD AMERICANA DE VAPORES, ("CSAV" or "Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant, ALLIED MARITIME INC. a/k/a ALLIED MARITIME ("Defendant") alleges, upon information and belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

2.      At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under the laws of Chile.

3.      Upon information and belief, Defendant was, and still is, a foreign corporation, or other business entity organized and existing under the laws of Liberia with an office in Greece.

4.      At all material times, Plaintiff was the disponent Owner of the motor vessel "SALMANCA" (hereinafter the "Vessel").

5.      By a charter party dated June 22, 2007, Plaintiff time chartered the Vessel to Defendant for the purpose of carriage by water of any lawful cargoes. A copy of the charter party contract is attached hereto as Exhibit 1.

6.    During the course of the charter, disputes arose between the parties regarding Defendant's failure to timely re-deliver the vessel under the charter party contract which provided for a maximum re-delivery date of September 17, 2007.

7.    In breach of the charter party contract the Defendant did not re-deliver the Vessel to CSAV until October 26, 2007.

FIRST CAUSE OF ACTION

8.    Plaintiff repeats, reiterates and re-alleges each and very allegation set forth in paragraphs One (1) through Seven (7) as if the same were more fully set forth at length herein.

9.    As a result of Defendant's breach of charter party contract, Plaintiff has sustained damages in the principal amount of $1,209,351, exclusive of interest, arbitration costs and attorneys fees.

10.    Plaintiff has calculated the principal amount due based on the difference between the market rate of hire of $56,509 per day (the average of the Baltic Exchange Supramax Index Rate) and the charter party rate of $25,500 for the 39 days the Vessel remained on hire to the Defendant beyond the contractual re-delivery date.

11.    Pursuant to the charter party, all disputes arising thereunder are to be submitted to arbitration in London with English Law to apply.

12.    Despite due demand, Defendant has failed and/or refused to pay the sums due and owing to Plaintiff.

13.    Plaintiff has commenced arbitration proceedings against Defendant.  A copy of CSAV's Claims Submission is attached hereto as Exhibit 2.

14.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in proceedings subject to English law.  As best as can now be estimated, Plaintiff expects to recover the following amounts in an arbitration award conducted pursuant to English law:

|     |                                                            |                 |
| --- | ---------------------------------------------------------- | --------------- |
| A.  | Principal claim:                                           | $1,209,351;     |
| B.  | Interest on claims:<br>3 years at 7.5%, compounded quarterly | $301,994.75;    |
| C.  | Estimated attorneys' fees and expenses:                    | $225,000; and   |
| D.  | Estimated arbitration costs:                               | $75,000.        |

**Total:**                                                                    **$1,811,345.75.**

## SECOND CAUSE OF ACTION

15.    Plaintiff repeats, reiterates and re-alleges each and very allegation set forth in paragraphs One (1) through Seven (7) as if the same were more fully set forth at length herein.

16.    As a result of Defendant's breach of charter party contract, Plaintiff has sustained alternative damages to those set out in the First Cause of Action in the principal amount of $480,231, exclusive of interest, arbitration costs and attorneys fees.

17.    Plaintiff has calculated the alternative principal amount due based on reference to a Joint Bulk Operation Agreement ("JBO") with non-party Nippon Kabushiki Kaisha ("NYK"). Under the JBO, CSAV and NYK agreed to share profit and losses of voyages conducted pursuant to the JBO equally.

18.    NYK entered into a Contract of Affreightment ("COA") with on-party Compania Minera Dona Ines de Collahusi SCM by which NYK obliged itself to lift a cargo of copper concentrates from Chile to various Japanese, Chinese and Korean ports.  The freight rate under the COA is US$40.49 per ton net.

3

19.    But for the late re-delivery of the Vessel by Defendant NYK could have utilized the Vessel to lift the cargo under the COA. Instead, NYK was compelled to re-let the cargo to non-party Mistui OSK Lines ("MOL") using the M/V Angel Accord at the substantially higher freight of USD$85 per ton.

20.    The difference between the COA freight rate and the M/V Angel Accord re-let is US$ 42.51 (US$ 85 less US$40.49). The cargo lifted under the COA was 11,296.90 tons and therefore total losses are US$480,231.

21.    Pursuant to the charter party, all disputes arising thereunder are to be submitted to arbitration in London with English Law to apply.

22.    Despite due demand, Defendant has failed and/or refused to pay the sums due and owing to Plaintiff.

23.    Plaintiff has commenced arbitration proceedings against Defendant. A copy of CSAV's Claims Submission is attached hereto as Exhibit 2.

24.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in proceedings subject to English law. As best as can now be estimated, Plaintiff expects to recover the following amounts in an arbitration award conducted pursuant to English law:

| | | |
|---|---|---|
| A. | Alternative principal claim: | $480,231; |
| B. | Interest on claims:<br>3 years at 7.5%, compounded quarterly | $119,921.55 |
| E. | Estimated attorneys' fees and expenses: | $225,000; and |
| F. | Estimated arbitration costs: | $75,000. |
| **Total:** | | **$900,152.55.** |

4

25.     The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant.

26.     The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.     That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any

other funds held by any garnishee within the District which are due and owing to the Defendant, in the amount of **$1,811,345.75** calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

     D.     That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

     E.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

     F.     That this Court award Plaintiff its attorney's fees and costs of this action; and

     G.     That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: February 27, 2008
       New York, NY

               The Plaintiff,
               COMPANIA SUD AMERICANA DE VAPORES

               By: _____
               Kevin J. Lennon
               Charles E. Murphy
               LENNON, MURPHY & LENNON, LLC
               420 Lexington Ave., Suite 300
               New York, NY 10170
               (212) 490-6050 – phone
               (212) 490-6070 – fax
               kjl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    City of New York
County of New York  )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    February 27, 2008
          New York, NY

_____
Charles E. Murphy

# EXHIBIT 1

# Time Charter

## 2ND. ORIGINAL

GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 **This Charter Party,** made and concluded in *Valparaiso* ................................ *22nd* ......... day of ........ *June, 2007* .......
2 Between . *Compañia Sud Americana de Vapores S.A.*
3 Owners of the good ................................................ Steamship/Motorship *M.V. " SALAMANCA " (See Clause 40)* of ...........................
4 of ........................ tons gross register, and ........................ tons net register, having engines of ........................ indicated horse power
5 and with hull, machinery and equipment in a thoroughly efficient state, and classed .................................................
6 at ........................ of about ........................ cubic feet bale capacity, and about ........................ tons of 3349 Ha.
7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one-and-one-half-percent-of-ship's deadweight capacity,
8 allowing a minimum of fifty tons) on a draft of ........................ feet ........................ inches on ........................ Summer freeboard, inclusive of permanent bunkers,
9 which are of the capacity of about ........................ tons of fuel, and capable of steaming, fully laden, under good weather
10 conditions about ........................ knots on a consumption of about ........................ tons-of-best-Welsh-coal—best-grade-fuel-oil—best-grade-Diesel-oil,
11 now ........................
12 ........................ and ... *Allied Maritime Inc* ........................ Charterers of the City of . *Monrovia*
13 **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14 *1 time charter trip from far east to west coast south america via safe port(s), safe berth(s), safe anchorage(s), arrival,*
15 *estimated duration about 50/60 days, but max date of redelivery to be 17th september, 2007.* ........ within below mentioned trading limits.
16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17 the fulfillment of this Charter Party.
18 Vessel to be placed at the disposal of the Charterers, at *on DLOSP Saganoseki* .........................., *any time day/night, Sunday and holiday*
19 *included*
20 in-such-dock-or-at-such-wharf-or-place-(where-she-may-safely-lie,-always-afloat,-at-all-times-of-tide,-except-as-otherwise-provided-in-clause-No.-6),-as
21 the-Charterers-may-direct.-If-such-dock,-wharf-or-place-be-not-available-time-to-count-as-provided-for-in-clause-No.-5. Vessel on her delivery *and during this*
    *charter period* to be
22 ready to receive cargo with clean-swept *washed down and dried up holds, free from rust, flake, scales, residues of previous cargo* holds and
    tight, staunch, strong and in every way fitted for the service, having water ballast, winches and
23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25 dise, including-petroleum-or-its-products, in proper manner, excluding *...See Clause 67.*
26 (vessel is not to be employed in the carriage of Live Stock, but-Charterers-are-to-have-the-privilege-of-shipping-a-small-number-on-deck-at-their-risk,
27 all-necessary-fittings-and-other-requirements-to-be-for-account-of-Charterers), in such lawful trades, between safe port and/or ports in-British-North
28 America,-and/or-United-States-of-America,-and/or-West-Indies,-and/or-Central-America-and/or-Caribbean-Sea,-and/or-Gulf-of-Mexico,-and/or
29 Mexico,-and/or-South-America
30 and/or-Africa,-and/or-Asia,-and/or-Australia,-and/or-Tasmania,-and/or-New-Zealand,-but-excluding-Magdalena-River,-River-St.-Lawrence-between    -and/or-Europe
31 October-31st-and-May-15th,-Hudson-Bay-and-all-unsafe-ports;-also-excluding-when-out-of-season,-White-Sea,-Black-Sea-and-the-Baltic,
32 *Worldwide trading always afloat, via safe berth(s)/port(s)/anchorage(s) within Institute Warranty Limits excluding war and*
33 *warlike zone and Cuba/Israel/N. Korea/Iraq/Libya/Nigeria/Lebanon/Cambodia/Somalia/Angola/Albania/Russian Pacific*
34 *ports/Bosnia and Herzegovina/Yugoslavia. Should the political, social and/or other situation for a normal trading of the*
    *vessel in the above allowed or excluded countries/area change, then such country(ies)/area(s) shall be excluded or allowed*
    *through the mutual discussion, agreement and conditions if any.*
35 as the Charterers or their Agents shall direct, on the following conditions:
36   1.   That *whilst on hire* the Owners shall provide and pay for all provisions, *drinking water,* wages and consular shipping and discharging fees of the
    Crew; shall pay for the
37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, machinery and equipment *with all certificates necessary to comply with requirements at ports of*
    *call and canals* for and during the service.
39   2.   That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory* Pilotages, Agencies
    *for clearance and cargo, boatage on Charterers' business,* Commissions,
40 Consular Charges (except those pertaining to the Crew *and flag),* and all other usual expenses except those before stated, but when the vessel puts into
41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43 charter to be for Charterers account. All-other-fumigations-to-be-for-Charterers-account-after-vessel-has-been-on-charter-for-a-continuous-period
44 of-six-months-or-more. *See Clause 42.*
45 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage *lashing materials* and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47 for dunnage, they making good any damage thereto.
48   3.   That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining-on
49 board-the-vessel-at-the-current-prices-in-the-respective-ports;-the-vessel-to-be-delivered-with-not-less-than ........................ tons-and-not-more-than
50 ........................ tons-and-to-be-re-delivered-with-not-less-than ........................ tons-and-not-more-than ........................ tons.



51    4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 25,500 (twenty five thousand five hundred dollars)*

52  ~~................ United States Currency per~~ *day or pro rata including overtime* ~~on on vessel's total deadweight-carrying capacity, including bunkers and~~

53  ~~stores, on ..................................... summer freeboard, per Calendar Month,~~ commencing on and from the *time* day of her delivery, as aforesaid, and at

54  and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port arica/coronel range, port in*

56  *Charterers' option, any time day/night, Sunday and holiday included* unless otherwise mutually agreed. Charterers are to give Owners

57  *30/20/10 days approximate and 5/3 days definite* ~~not less than ........................................................................................~~ days

  notice of vessels expected date of re-delivery, and probable port.

58    5.  Payment of said hire to be made in *New York* in cash in United States Currency, semi-monthly in advance, and for the last half month or

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62  terers *after serving minimum three banking days notice*, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time

  ~~to count from 7 a.m. on the working day~~

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66  to 2 1/2% commission *plus any VAT payable under the Chilean law* and such advances shall be deducted from the hire. The Charterers, however, shall in

  no way be responsible for the application

67  of such advances.

68    6.  That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70  ~~lie aground.~~

71    7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74  ~~paying Owners .......................................................... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76    8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78  agency; and Charterers are to load, stow, and *secure and discharge* ~~trim~~ the cargo at their expense under the supervision *and responsibility* of the Captain,

  who, *if requested to do so by Charterers*, is to sign Bills of Lading for

79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *See Clause 59*

80    9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82    10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free *and suitable* accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of *US$10.00* ~~$1.00~~ per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85  Clerks, Stevedore's Foreman, etc., ~~Charterers paying at the current rate per meal, for all such victualling.~~

86    11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88  terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, showing the course of the vessel and distance run and the con-

89  sumption of fuel.

90    12.  That the Captain shall use diligence in caring for the ventilation of the cargo.

91    13. ~~That the Charterers shall have the option of continuing this charter for a further period of .................................................................................~~

92  ~~.............................................................................................................................................................................................................~~

93  ~~on giving written notice thereof to the Owners or their Agents .......................... days previous to the expiration of the first named term, or any declared option.~~

94    14.  That if required by Charterers, time not to commence before ............. *16th July, 2007 ....................................................* and should vessel

95  not have given written notice of readiness on or before *17th July, 2007 ................................................* but not later than 4 p.m., Charterers or

96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97    15.  That in the event of the loss of time from deficiency *and/or default of men and/or strike or sabotage by officers/crew or deficiency*

  of men or stores, fire, breakdown or damages to hull, machinery or equipment,

98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause *whatsoever*

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101  thereof, and all extra expenses shall be deducted from the hire.

102    16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105    The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107    17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* ~~New York,~~

108  one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109  the purpose of enforcing any award, this agreement may be made a rule of the Court, The Arbitrators shall be commercial men. *This Charter Party shall be*

  *governed by and construed in accordance with English Law.*

110    18.  That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113  might have priority over the title and interest of the owners in the vessel.

114    19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and



2ND. ORIGINAL

15  Crew's proportion. General Average shall be adjusted, stated and settled *in London according to York-Antwerp Rules, 1994 or any amendment*
*thereto.* according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
16  York-Antwerp Rules 1924, or such part or place in the United States as may be selected by the carrier, and as to matters not provided for by these
17  Rules, according to the laws and usages at the port of *London.* New York-In such adjustment disbursements in foreign currencies shall be exchanged into
18  United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
19  the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
20  bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
21  or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
22  required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
23  carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
24  place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit-balances, if any, shall be paid in
25  United States money. *Hire not to contribute to General Average.*
26  In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
27  whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the
28  goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
29  losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
30  goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
31  ship belonged to strangers. *New Jason Clause as attached.*
32  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder,
33  20.  Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
34  cost of replacing same, to be allowed by Owners.
35  21.  That as the vessel may be from time to time dry-docked in tropical waters during the term of this Charter, Vessel is to be docked at a
36  convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
37  time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
38  ...............................................................................................................................................................................................................
39  ...............................................................................................................................................................................................................
40  22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of *lifting capacity as described* handling lifts up to three
tons, also
41  providing ropes, falls, slings and blocks *as on board.* If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
42  same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient light for night work free*
*of expense to Charterers* lanterns and oil for
43  night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
44  Charterers to have the use of any gear on board the vessel.
45  23.  Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
46  steamer to provide one winchman one hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
47  deck-hands and dockeymen for overtime work done in compliance with the working-hours and rates stated in the ship's articles. If the rules of the
48  port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. *Shore winchmen to be employed and paid for by*
*Charterers.* In the event of a disabled winch or winches, or
49  insufficient power to operate winches, Owners to pay for shore *appliances*, engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
50  thereby.
51  24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
52  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
53  etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
54  of which are to be included in all bills of lading issued hereunder:
55  U. S. A. Clause Paramount
56  This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
57  16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
58  any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
59  be repugnant to said Act to any extent such term shall be void to that extent, but no further.
60  Both to Blame Collision Clause
61  If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
62  Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
63  hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
64  or liability represents loss of or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
65  carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
66  owners as part of their claim against the carrying ship or carrier. *See Clause 60*
67  25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
68  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
69  port or to get out after having completed loading or discharging.
70  26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
71  navigation of the vessel *acts of pilots and tug boats,* insurance, crew, and all other matters, same as when trading for their own account.
72  27.  A commission of 2 1/2 per cent is payable by the Vessel and Owners to
73  ...............................................................................................................................................................................................................
74  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
75  28.  An address commission of 2 1/2 per cent payable to .............................................................................................on the hire earned and paid under this Charter.

*Clause 29 – 101, as attached, are deemed to be fully incorporated in this Charter Party.*
*The original Charter Party to be possessed by Owners.*



2ND. ORIGINAL

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

Owners:                                   Charterers:



2ND. ORIGINAL

- 1 -

## Rider Clauses to MV "SALAMANCA"
## Charter Party dated 22nd June, 2007

29. Superficial Inspection

Charterers to have the option of holding a superficial inspection prior to delivery and also at any time of this Charter, Owners and Master giving every facility and assistance to carry this out.

30. Notice of Delivery

Owners are to give 20/15/10/8 days definite notice of the date of delivery under this Charter Party to : " CSAV Bulk telex 330681 "

31. Bunker on Delivery / Redelivery

1) Same bunkers quantity and prices on delivery and redelivery.
Estimated bunkers on delivery, about 1,200 MT of IFO and abt 110 MT of MDO.
Prices for IFO, USD 370.00 pmt for IFO and USD 700.00 pmt for MDO

2) Owners have the privilege of supplying bunkers at their expenses during the loading and discharging under this Charter, provided same does not interfere with the loading and discharging operation. Charterers have the privilege of supplying bunkers at their expenses prior to delivery, provided same does not interfere discharging by Owners.

3) Replenishment of bunkers to be carried always under the supervision and responsibility of Master, who to pay due diligence for replenishment of bunkers so as not to cause oil spillage and/or any other accidents while bunkering.

32. Without Cleaning Option

Charterers have the option of redelivering the vessel with holds as are discharged and left by stevedores, without hold cleaning including dunnage disposal in consideration of which Charterers to pay Owners US$4,000.00 (Four Thousand United States Dollars) lumpsum.

33. On / Off Hire Survey

On/Off hire to be held on delivery and redelivery in order to ascertain the vessel's condition and quantity of bunkers.



(to be continued)

2ND. ORIGINAL

- 2 -

Joint off-hire survey on redelivery in Charterers' time, but expenses to be equally shared between Owners and Charterers.

### 34. Stevedore Damage

Stevedores to be appointed and paid by Charterers but to work under supervision of Master. Should any damage be caused to the vessel or her fittings by stevedores, Master has to try to let stevedores repair the damage and will try to settle the matters directly with them at the first stage. If the damage cannot be repaired by stevedores, Master has to try to obtain written acknowledgement of the damage and liability from stevedores otherwise Charterers shall not be held responsible for the damage. Master to notify Charterers or their agents of such damage within 24 hours after the damage occurs or by the vessel's sailing from port of occurrence. Charterers to have the privilege of redelivering the vessel without repairing the stevedores' damage, for which Charterers are responsible, incurred during the currency of this Charter as long as the damages do not affect seaworthiness, but Charterers undertake to reimburse the repairage against the production of repair bills by dockyard unless otherwise agreed.

### 35. Documentations

Vessel's cargo gear, and all other equipments to comply with the regulations and/or requirements in effect at ports of call and canals and vessel is at all times in possession of valid up-to-date certificate on board necessary to comply with such regulations, and/or requirements, including gear dispute. A particular reference is made to the United States Department of Labour Safety sand Health Regulation set force in part III, Code of the Federal Regulation and also all Australian Navigation (Loading and Unloading Safety Measures) Regulations, 1961 or any amendments thereto, and related requirements and recommendations. Although other provisions of this timecharter make it the responsibility of Owners, it is agreed that, should vessel not meet the regulation and/or requirements Owners to make immediate corrective measures and that time lost thereby, any stevedores' standby time and expenses involved to be for Owners' account.

### 36. Boycott etc.

Should the vessel be boycotted, picketed, blacklisted or in similar incident at any port or place by the shore and/or port labour and/or the tug boats and/or the pilots, or the government and/or any authority, by reason of vessel's flag or the terms and conditions on which members of the Officers/Crew were employed or by reason of other vessels



(to be continued)

2ND. ORIGINAL

under the same ownership, management, operation or control or by reason of vessel's construction and/or her cargo gear and/or her fittings and/or her other equipment, all consequence and any extra expenses incurred therefrom to be for Owners' account and Charterers are entitled to put the vessel "off-hire" for any time lost by such reason.

37. Eligibility for Bunkers

Owners warrant that vessel is eligible for bunkers in the United States of America, its territories and possessions in accordance with governing Export Control Regulations also Owners warrant that vessel is eligible for bunkers in any other countries, if required.

38. Delete

39. Oil Pollution

(1) Owners warrant that throughout the currency of this charter they will provide the vessel with following certificates :

  (a) Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S. Code, Section 1321 (p)).

  (b) Certificate issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with Part 138 of Coast Guard Regulation 33 CFR.

(2) Notwithstanding anything whether printed or typed herein to the contrary,

  (a) save as required for compliance with paragraph (1) hereof, Owners shall not be be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

  (b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters other than to the extent provided in paragraph (1) hereof.



(to be continued)

2ND. ORIGINAL

· 4 ·

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holder of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave port, place or waters, other than to the extent provided in paragraph (1) hereof.

(3) Charterers warrant that the terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this charter.

40. Vessel's Description
- All figures "about"

| | |
|---|---|
| Type of Vessel | : About 46,600 MT DWT Bulk Carrier to be built at Kanasashi Shipbuilding Co., Ltd. or Shin Kurushima Dockyard Co., Ltd. at Owners' option |
| Flag | : Panama |
| Class | : N.K. |
| LOA / LBP / B / D | : 188.0 m / 174.3 m / 31.0 m / 16.5 m |
| Gross Tonnage | : 26,200 |
| Deadweight | : 46,600 MT on 11.65 m of scantling draft 41,550 MT on 10.65 m of designed draft |
| No. of Holds/Hatches | : 5 / 5 (Type of Hatch Covers : Folding type) |
| Cargo Hold Capacity | : Grain / Bale : 58,200 m3 / 57,000 m3 |
| Hatch Dimensions | : No.1: 14.4 m x 15.6 m, Nos.2/3/4/5: 19.2 m x 15.6 m |
| Tank Top Local Strength | : Nos.1/3/5 : 23.0MT/M2    / Nos.2/4 : 16.0MT/M2 |
| Ore Strengthen | : Holds No.s 1, 3 and 5 to be used |
| CO2 Fire Extinguisher | : Fitted in holds |
| Crane | : 30 Ton x 4 sets |
| Grab | : Nil (Grab stay fitted on deck suitable for 7M3 to 10M3 grabs) |
| M/E | : 1set of 6UEC 52LS |
| | M.C.R.              : 7,487 kw (10,180 ps) x 114 rpm |
| | N.S.R.(85% M.C.R.): 6,364 kw (8,653 kw) x 108 rpm |

2ND. ORIGINAL

(to be continued)

Speed and Consumption :

- Figures as below are all "about", and under good weather/sea condition upto and including Beaufort Scale Force 4.
- Bunker grade IFO (IF-380 CST) ISO 8217 RMH35 and MDO ISO8217 DMB.
- Economical speed and consumption are without guarantee.
- No diesel oil at sea, but the vessel entitles to use reasonable quantity of diesel oil for main engine and generator engines when maneuvering in narrow/shallow/busy water area, canals, rivers, in/out port, shift of generator engine, engine starting/stopping etc. under the discretion of Master.

At sea :

| Speed | Consumption for | Consumption for |
|---|---|---|
| | Main engine IFO(3,500sec.) | Aux.enginesIFO (3,500sec.) |
| 13.5 knots (on designed draft) 28.0 MT | | 2.0 MT |

Tank Capacities        : FO 1,800 m3 / DO 140 m3 /
                         Fresh Water (incl.drinking water) 300 m3
                         Water ballast (incl.No.3 Hold/Water ballast) 23,000 m3

### 41. Arab Blacklist

Owners guarantee that neither this vessel nor any other vessel under their Ownership/Management/control has ever called at any Israeli port and will not call at any such port prior to or during the currency of this charter. Owners also guarantee that neither this vessel nor any other vessel under their Ownership/Management /control is blacklisted by any Arab countries.

### 42. Deratisation Certificate

Vessel to be delivered with valid deratisation or deratisation exemption certificate on board, any if this does not cover the whole period of this Charter and renewal or certificate and sanitary inspection certificate of fumigation is necessary, cost of same and delay of vessel and any expenses incurred therefrom to be for Owners' account unless caused by ports called or cargoes carried under this Charter Party.

### 43. Quarantine

Normal quarantine time and expenses to enter the port to be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness etc. of Master, officers and crew to be for Owners' account, unless caused by ports called or



2ND. ORIGINA

(to be continued)

cargoes carried under this Charter Party.

## 44. Vaccination
Owners to arrange at their expenses that Master, Officers and Crew of vessel hold valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

## 45. Stowage
Owners and Master to undertake best efforts to co-operate with Charterers for best stowage of cargo, and Master to make best efforts to collect, restrow, and provide any useful dunnage, lashing etc., including pre-slings/wire slings, not broken for next use after completion of voyage, during the currency of this Charter, if requested to do so by Charterers.

## 46. Shape up Hatches/Cranes
Before and upon arrival at a port, vessel's officers/crew to shape up vessel's hatches, cranes and gangway in order to commence loading and/or discharging without delay. All opening and last closing of all hatch cover shall be done by officers/crew at free of expenses, provided shore regulations permit.

## 47. Smuggling
Any delay, expenses and/or fine incurred o account of smuggling to be for Charterers' account if caused by Charterers, supercargo and/or their staff or agents, and to be for Owners account if caused by officers and/or crew.

## 48. Gangway Watchman
Gangway watchmen to be for Owners' account, unless hire of them is compulsory.

## 49. Owners Agent
Owners to appoint Owners' agents to attend to all Owners' matters such as General Average, dry docking, hospitalization, repatriation of crew, repair, supply of vessel's stores and provisions etc. In case Owners are unable to arrange same, Charterers agree to have their agents attend to such matters with Owners paying Charterers' agents actual expenses and agency fee according to Charterers' tariff rate.



2ND. ORIGINAl

(to be continued)

#### 50. Deduction of Hire

Charterers shall have the liberty to deduct from hire payment any amount disbursed for Owners' account supported by vouchers. Charterers have the further liberty to deduct estimated cost for bunker on redelivery and amount of outstanding disbursements for Owners account for which vouchers have not yet reached Charterers, from last sufficient regular payment.

#### 51. Deviation / Put Back

In the event of loss of time either in port or at sea, deviation from the course of the voyage of putting back whilst on voyage, caused by sickness of or an accident to or misconduct by Master/officers/crew, or caused by stowaway, refugee or any person on board vessel other than persons travelling by request of Charterers or reason of the refusal of Master or Officer(s) or crew to perform their duties or of any hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back until vessel is again efficient in the same position or regains the line of voyage whichever shorter distance therefrom and all expenses incurred, including bunkers consumed during such period of suspension, shall be for Owners' account.

#### 52. Saving Life / Refugee

Owners shall have the liberty to deviate for the purpose of saving life at sea and landing the persons saved. But in case it is found the person is a refugee, Owners to indemnify Charterers against all consequences of liability arising therefrom and anytime hereby lost and extra expenses to be for Owners' account..

#### 53. Crane Breakdown

In the event of breakdown of cranes or derricks by reason of disablement or insufficient power, the hire to be reduced pro rata for the period of such inefficiency in relation to the number of hatches available. Owners to pay in addition the cost of labour either idle or additionally engaged, because of the breakdown. This does not exempt Owners from liability for the cost of hiring shore appliances, if required by Charterers in accordance with Clause 23. If shore appliances are hired by Owners the hire of the vessel to be paid in full deducting actual time lost by breakdown.

#### 54. Seizure / Detention / Arrest



Should vessel by seized or detained or arrested or delayed by any authority during the currency of this Charter party, all time lost by this reason shall be treated as off-hire

2ND. ORIGINAL

(to be continued)

until the time of her release unless such seizure or detention or arrest or delay is occasioned by any act or omission or default of Charterers or their agents. Any extra expenses incurred by and/or during above seizure or detention or arrest or delay to be for Owners' account, unless caused by Charterers as above.

### 55. Requisition

Should vessel be requisitioned by any Goverament or Governmental Authority during the period of this Charter she shall be off-hire during the period of such requisition and any hire or other compensation paid by any Government or Governmental Authority in respect of such requisition shall be for Owners' account. However, Charterers have the option of cancelling the balance of period of this Charter.

### 56. Major War

If major war breaks our between any two or more the following countries :
United Kingdom, U.S.A., Peoples Republic of China, Russian Federation, Japan directly affecting the performance of this charter, both Owners and Charterers shall have the option of cancelling this charter, whereupon Charterers shall redeliver the vessel to Owners, if she has cargo on board after discharge thereof at destination or, if debarred from reaching or entering it, at a near open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or at sea at a near and sage port as directed by Charterers. In all cases hire shall be paid until vessel's redelivery.

### 57. War Risk Insurance

Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also Crew War Bonus, if any, to be for Charterers' account. The order of Owners' War Risk Underwriters always to be followed.

### 58. Dangerous Cargo

Charterers shall have the option to load maximum 500 tons of dangerous cargoes which is classed in Item 3, 4, 5 and 9 in IMCO Regulations provided the same are packed, labelled, loaded, stowed, carried and discharged in accordance with regulations/recommendations of IMO and the vessel's class.



2ND. ORIGINAL

(to be continued)

- 9 -

### 59. B/L Signature

Charterers and/or their agents are hereby authorized by Owners to sign on Master's and/or Owners' behalf Bills of Lading as presented in accordance with Mate's or Tally Clerk's receipts without prejudice to this Charter Party, but Charterers to accept all consequences that might result from Charterers and/or their agents signing Bills of Lading not adhering to the remarks in Mate's or Tally Clerk's receipts.

### 60. Clause Paramount

New Jason Clause, New Both-to-Blame Collision Clause, Chamber of Shipping War Risks Clause 1, 2 and 3, and U.S.A. Clause Paramount or Canadian Paramount or any other similar enactment in the country of shipment given effect to the Hague Rule 1924, where applicable shall be deemed to form a part of this Charter Party and incorporated in Bill(s) of Lading issued hereunder.

### 61. NYPE Interclub Agreement

Liabilities for cargo claims, including customs fine if imposed, shall be borne by Owners/Charterers in accordance with the Interclub New York Produce Exchange Agreement in September 1996 and any subsequent amendments.

The party having paid the claim shall submit to other party supporting documents as soon as possible.

### 62. P&I Club

Owners guarantee vessel is fully covered by the Britannia and Charterers to have the benefit of Owners cover granted by the P & I Club so far as the Club rules permit.

### 63. Padeye

Charterers' option to weld padeyes under Master's supervision and subject to Master's approval, which not to be unreasonably withheld and Charterers' further option to redeliver the vessel without removal of padeyes, in consideration of which Charterers to pay Owners US$10.00 per padeye.

### 64. Cargo on Deck/Hatch Cover

Charterers' option to load cargo on deck/hatch covers which to be loaded in accordance with vessel's stability, seaworthiness and strength under Master's supervision and subject to Owners' approval. Bill of Lading for cargo carried on deck/hatch cover to be claused "Carried on deck/hatch cover at shippers' risk without liability of Owners for



**2ND. ORIGINAL**

(to be continued)

loss or damage, howsoever caused."

### 65. Light Cargo
Owners undertake that the vessel can navigate safely with light cargo such as cars only without ballast in holds/deeptanks subject to vessel's stability.

### 66. Strike/Labour Stoppage
In the event that the vessel is delayed or rendered inoperative by strike, labour stoppage or other difficulties due to Ownership, registry or lack of health certificates of Officers/Crew, such time lost to be considered as off-hire.

### 67. Cargo Exclusions
Lawful merchandise only to be carried, but excluding :

livestock, injurious, inflammable, dangerous, hazardous, corrosive good (per IMDG Code) which include radio and radio active goods and its waste and nuclear products, motorblocks and turnings, hides, acids, explosives, calcium carbide, tar, pitch, ferro silicon, black powder, ammonium nitrates (except sodium nitrate, which maximum quantity of about 3,500MT and not loaded in No.5 Hold), asbestos, asphalt, bitumen, quebracho, calcium hypochloride, direct reduced iron (including HBI), sponge iron, quick lime, creosoted goods, naphtha, sunflower seed expellers, copra, spent oxide, logs, fishmeal, carbon black, arms and ammunition or other warlike materials or its items, and chacoal.

- Any concentrates to be loaded in accordance with regulations/recommendations of IMO and the vessel's Class.

- Subject to Charterers' prior notice to Owners, acids in drums, calcium hypochloride in drums, bitumen in drums, are allowed to load provided packed, labelled and stowed, in accordance with IMO and/or U.S. Coast Guard regulations, and the vessel's Class. Any extra insurance premium/expense incurred by loading such cargo to be for Charterers' account.

### "Cement"
Charterers have privilege of carrying cement in bulk but maximum two (2) voyages per year which shall not be the last voyage before redelivery nor consecutive voyage.
In case of cement loading, Owners consent that Charterers to refit the vessel's hatch



2ND. ORIGINA

(to be continued)

arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent. English law to apply.

Notwithstanding anything to the contrary herein, any dispute howsoever based arising out of or in connection with this charter where the principle amount in dispute is less than US$50,000.- shall be referred to arbitration in London in accordance with the London Maritime Arbitrators Association Small Claims Procedure.

82. Delete

83. Anti-Drug Abuse Act

Charterers have concluded "Sea Carrier Initiative Agreement" with U.S. Customs in accordance with enforcement of "U.S. Anti-Drug Abuse Act of 1986".

Owners hereunder agree to cooperate with the terms of "Sea Carrier Initiative Agreement" which regulates the following in Clause 12 of "U.S. Anti-Drug Abuse Act of 1986"

"In the event that vessels operated by the carrier are not owned by or under the management or control of the carrier, the carrier will make every effort to see that vessel's owners agree to the terms of this carrier initiative agreement."

84. I.T.F.

Owners guarantee that vessel's officers and crew are being paid and employed in compliance with I.T.F. requirements in Australia and any ports of call.

85. Delete

86. Delivery/Redelivery Time

GMT to be applied for a purpose of hire payment.

87. Cargo Release without B/L

Should original B/L not arrive at discharging port in time, Owners agree to release entire cargo without presentation of original B/L, and Charterers hereby state that they shall indemnify Owners against all consequences arising from Owners conforming to Charterers to issue single Letter of Indemnity to Owners in accordance with Owners' P & I Club wording.



2ND. ORIGINAL

(to be continued)

# EXHIBIT 2

# HOLMAN FENWICK & WILLAN

| | | | | |
|---|---|---|---|---|
| R W Crump | N D Campbell | G D Lamplough | J Butterworth** | **Consultants** |
| C R Lowe | P G Bennett | L M Katz | J P G Campbell | W A Bishop |
| R G Wilson | A A Bandurka | R J Wilmot | E K Dautlich | *Examiner in Admiralty* |
| H M Brown | M R Bowman | N J Barr | N B Wick | J R M O'Sullivan |
| Lord Byron | P J Hatzer | A G Dekany | J C Cashman* | P Rees Smith |
| S P Drury | P A Wareham | R J Mabane | S H Roberts | T J Boden* |
| G Q Gray | S S Davidson | D France | C A Neame | J A Dillon |
| H J Livingstone | H W Dunlop | A A Duffield | J J Clark | P B Davies* |
| S J Paull | P R Wordley | J E Forrester | J M Wandless | |
| P T Aston | R W Balson | R C A Gogarty | R Dajani | |
| J P J Duff | C S Lockwood | A H Johnston | R H P Jowett | |
| G Brajeux* | C S Swart | C C Frangeskides | C S C Quennell | |
| J-J Ollu* | G W Williams | E C M Tay Pamarr* | D Roylance*** | |
| R G G Osborne | A B Mackie | A D W Robinson | P T Murphy | |
| J C Gosling | J B Mackay | E R Newitt | A R West | |
| O M Sefton | P P C Yeung | B S J Perrott | A P Apostolis | |
| S K Blows | A A Leir | R C Springall | D A G Brookes | |
| T P Clemens-Jones** | J L Drueger | G J Vallely | M R Allcoat | |
| G M T Eddings | A M W Dunn | R E Baines | K Dhir | |
| J C Pierce | R M Hopkirk | A R Chamberlain | T R H Stephens | |
| V E Pitroff | H C M Fung | S J Sloane | A M Feeney | |
| R N Hutton | R P Dean | D E Vassos | S Lequeette* | |
| G J V Hardaker | J G Webb | P A Smith | M J Pilkington | |
| S W Congdon | W Kerr | D J Honey | L Y Tan | |
| O M Purcell** | S Selegny* | D G Relf | D Horovicz ^ | |
| J A Tooker | S Elleboode-Merlier* | M W Morrison | | |

Marlow House
Lloyds Avenue
London EC3N 3AL
Tel +44 (0)20 7488 2300
Fax +44 (0)20 7481 0316

holmans@hfw.co.uk
Telex 8812247 HFWLON
DX 1069 London City EC3
VAT No GB 243 4838 55

**www.hfw.com**

| | | |
|---|---|---|
| **Your Ref** | **Direct Line**   +44 (0)20 7264 8310 | **Date** |
| **Our Ref**   RDB/387/JJC | **Email**   rory.butler@hfw.co.uk | 27 February 2008 |

**BY POST**
Mr Bruce Buchan
44 Nadine Street
London
SE7 7PG

Mr. Colin Sheppard
43 Park Road
Chiswick
London W4 3EY

Dear Sirs

## "SALAMANCA" – C/P DATED 22 JUNE 2007

### COMPANIA SUD AMERICANA DE VAPORES S.A. (Owners)
### v.
### ALLIED MARITIME INC. (Charterers)

We represent Owners in this matter and would be grateful if you would accept this letter as our client's Claim Submissions in this matter.

Attached is a small bundle of documents with an index to which we will be referring in the course of these Claim Submissions. References to tabs are to documents contained in this bundle.

1.     A fixture recap was agreed on 22 June 2007 by Owners for the trip time charter of 2 bulk carriers, "SALAMANCA" and the "PARADISE ISLAND", to Charterers **Tab 1**.

**Celebrating 125 years of serving international commerce**

**Paris     Rouen     Brussels     Piraeus     Dubai     Hong Kong     Shanghai     Singapore     Melbourne**

This firm is regulated by the Solicitors Regulation Authority.
A partnership of solicitors and registered foreign lawyers. All partners are solicitors except where otherwise shown.
*Maître Mariner     * Avocat à la Cour     ** Solicitor and Avocat à la Cour     *** Australian Legal Practitioner     ^ Avocat du Barreau de Bruxelles and Advocate of the Israel Bar

2.    A trip time charterparty for the "SALAMANCA" ("**the Vessel**") was drawn up between Owners and Charterers on the terms of a NYPE Form with additional clauses dated 22 June 2007 ("**the Charterparty**") **Tab 2**.

3.    The Charterparty provided, at lines 13-15:

> *"That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for 1 time charter trip from far east to west coast south america … estimated duration about <u>50/60 days</u>, but <u>**max date of redelivery to be 17 September 2007**</u>…"*

(emphasis added)

4.    The Vessel was delivered by Owners to Charterers on 17 July 2007 at 1730 hours LT, 0830 hours UTC, within the laydays 10-17 July 2007.

5.    The Vessel was redelivered by Charterers to Owners on 26 October 2007 at 1900 hours LT, 2200 hours UTC. Such redelivery was over a month late and in breach of the Charterparty. The expiry of the 60 day estimated trip duration took place on 15 September 2007, there being no further margin included by the parties. In any event, the express longstop date for redelivery was 17 September 2007.

6.    By reason of Charterers' breach of the Charterparty in redelivering the Vessel late, Owners claim the difference between the market rate of hire of US$56,509 – being the average of the Baltic Exchange Supramax Index rate (BSI) from 17 September to 26 October 2007 (less 11% to allow for the fact that the Vessel, a Handymax, is 11 % smaller compared to a Supramax) **Tab 3** and the Charterparty rate of US$25,500 for the period from 17 September 2007 to redelivery on 26 October 2007 at 2200 hrs UTC (39 days in total) Owners' claim, therefore, amounts to US$1,209,351. In the event that any dispute arises in relation to the market rate of hire, Owners reserve the right to adduce appropriate expert evidence in this regard.

7.    In the alternative, Owners claim for losses incurred as a result of the late redelivery in the sum of US$480,231:

(a)    At all times material to this claim, Owners operated a Joint Bulk Operation Agreement ("**the JBO Agreement**") with Nippon Yusen Kabushiki Kaisha ("**NYK**") **Tab 4**. Under the terms of the JBO Agreement, Owners and NYK agreed to share the profit and/or losses of voyages conducted pursuant to it equally (see clause 3.8 thereof).

(b)    On or about 28 July 2006, NYK entered into a COA with Compania Minera Dona Ines de Collahusi SCM ("**CMDIC**") **Tab 5** under which NYK agreed to lift a cargo of copper concentrates from Chile to various Japanese, Chinese and Korean ports. The freight rate under the COA is US$ 40.49 per ton net.

(c)    Had the Vessel been redelivered to Owners by the longstop date (17 September 2007), NYK could have her used to lift the cargo under the COA. Instead, NYK were forced

HOLMAN FENWICK & WILLAN                                                        Page No. 3

to re-let the parcel to Mitsui OSK Lines Ltd ("**MOL**") using the "ANGEL ACCORD" at a higher freight rate/cost (US$ 85 per ton)  **Tab 6**.

(d)     The differential between the COA freight rate and the "ANGEL ACCORD" re-let is US$ 42.51 (US$ 85 minus US$ 40.49). The parcel was 11,296.90 tons and therefore total losses are US$ 480,231.

(e)     By reason of the foregoing matters, NYK and Owners suffered losses, which Owners seek in this reference.

8.     Furthermore, Owners claim:

(a)     interest on such sum or sums as may be found to be due to them at such rate and for such periods as the Tribunal think fit pursuant to section 49 of the Arbitration Act 1996; and

(b)     the costs of this arbitration.


Yours faithfully


**HOLMAN FENWICK & WILLAN**

CC

**BY POST and E-MAIL (without enclosures)**
K-Law
18, Leosthenous & Filellinon Street
2nd Floor
Piraeus 185 36
Greece

email: johnk@k-law.gr

CC

**BY E-MAIL (without enclosures)**

Alan Parr, Legal Department, Allied Maritime
legal@allied.gr

HFWLDN\4997530-1